**UNITED STATES of America**

v.

**CUONG GIA LE**

**No. 1:03 CR 48.**

United States District Court, E.D. Virginia, Alexandria Division.

April 30, 2004.

---

344

James Trump, Assistant United States Attorney, United States Attorney's Office, Alexandria, VA, for Plaintiff.

Frank Salvato, Alexandria, James Goodman Connell, III, Devine & Connell PLC, Fairfax, Marvin D. Miller, Dale W. Dover, Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this three defendant[1] multi-count RICO[2] prosecution, only one defendant—Cuong Gia Le—is subject to the death penalty if convicted of any one of the four capital offenses with which he is charged, specifically two counts of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1) and two counts of murder in the course of a firearms offense in violation of 18 U.S.C. § 924(c)(1) and 924(j). The question presented here is whether, pursuant to 18 U.S.C. § 3593(a) and *United States v. Ferebe*, 332 F.3d 722 (4th Cir.2003), the government's Amended Notices of Intent to Seek the Death Penalty against Le ("Amended Death Notices") should stand or be stricken.[3]

---

1. Of the seven defendants indicted together in the *Second Superseding Indictment*, four have pled guilty.

2. Racketeer Influenced and Corrupt Organizations Act, codified at 18 U.S.C. § 1961 *et seq.*

3. This matter is disposed of promptly so that any appeal of this ruling may be promptly consolidated with the currently-pending appeals of previous rulings regarding Death Notice motions. Not addressed here are (i) Le's motion to strike aggravating factors alleged in

the government's original Death Notice, filed March 19, 2004, or (ii) Le's *motion to dismiss* or, in the alternative, to strike aggravating factors alleged in the government's amended notice of intent to seek the death penalty, filed April 16, 2004, except that the question of whether the government had good cause to amend the original Death Notice is necessarily addressed here as a threshold matter. The other aspects of motions (i) and (ii) will be addressed in a forthcoming memorandum opinion that also will address and resolve Le's constitutional challenge to the Federal Death

## I.

A history and summary of the allegations in this case may be found in previous memorandum opinions. *See United States v. Cuong Gia Le,* 311 F.Supp.2d 527, 530 (E.D.Va.2004) (detailed procedural history of the case with respect to defendant Le); *United States v. Cuong Gia Le, et al.,* 310 F.Supp.2d 763 (E.D.Va.2004) (description of all the indictments in this case up to the Fourth Superseding Indictment). Only a brief summary of the allegations giving rise to the capital charges against Le is necessary here.

Le stands charged with numerous racketeering-related and firearms offenses, including two counts of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1) and two counts of murder in the course of a firearms offense in violation of 18 U.S.C. § 924(j). These charges relate to a shooting at the Majestic Restaurant in Falls Church, Virginia on May 13, 2001 that resulted in the death of two individuals: Binh Anh Luu and Long Phi Nguyen.

Le was first charged with capital offenses stemming from the May 13, 2001 incident on December 4, 2003, when the government filed its Second Superseding Indictment.[4] On February 5, 2004, the government filed a Third Superseding Indictment. This indictment differed from the Second Superseding Indictment in that it alleged aggravating factors supporting imposition of the death penalty with respect to Le pursuant to 18 U.S.C. § 3592(c). On February 19, 2004, prior to the filing of any Death Notice, Le filed a Motion to Bar and/or Strike the Govern-

ment's Notice of Intent to Seek the Death Penalty, which was denied as premature by Order dated February 24, 2004. *See United States v. Cuong Gia Le,* Criminal No. 03–48–A (E.D. Va. Feb. 24, 2004) (Order). The government did not file its first Death Notice until February 27, 2004. Le promptly moved to strike this Death Notice as untimely on March 1, 2004, which motion was denied by memorandum opinion and order dated March 29, 2004. *See United States v. Cuong Gia Le,* 311 F.Supp.2d 527 (E.D.Va.2004) (holding that government's original Death Notice was filed a reasonable time before Le's capital trial in accordance with 18 U.S.C. § 3593(a) and *Ferebe* ). On March 19, 2004, the government filed an Amended Death Notice, which added four non-statutory aggravating factors identified under 18 U.S.C. § 3593(a)(2), namely (1) gang affiliation; (2) history of violence; (3) evidence from guilt phase; and (4) lack of remorse. Under the section titled "history of violence," the government identified the following nine violent incidents in which Le was allegedly involved:

a. On or about March 14, 1994, in Falls Church, Virginia, the defendant, CUONG GIA LE, carried a concealed weapon, specifically a sword with a 16–inch blade.

b. On or about May 15, 1995, in Fairfax County, Virginia, the defendant, CUONG GIA LE, and another individual threatened rival gang members, and LE's associate shot and wounded one of the rival gang members.

Penalty Act, codified at 18 U.S.C. §§ 3591–3597.

**4.** Le was originally charged on January 30, 2003 on a two-count indictment with conspiracy to affect commerce by robbery in violation of 18 U.S.C. § 1951 and unlawful use

and carrying of firearms in violation of 18 U.S.C. §§ 924(c) and 2. On September 25, 2003, the government filed its First Superseding Indictment, adding four defendants, but no new charges against Le.

c. On or about January 26, 1997, the defendant, CUONG GIA LE, together with Lam Nguyen Chau, Hoang Anh Tran, and Thiet Phan, intentionally killed Long Hung Nguyen and wounded a second person at the Hai Au Pool Hall, Falls Church, Virginia.

d. On or about July 13, 1997, the defendant, CUONG GIA LE, shot at an individual outside of a business located at 6763 Wilson Boulevard, Falls Church, Virginia.

e. On or about May 17, 1998, on Backlick Road in Fairfax County, Virginia, the defendant, CUONG GIA LE, forced a car occupied by two individuals to stop, forcibly pulled the occupants out of the car, and assaulted one of the occupants. LE targeted one of the occupants because the occupant had previously provided information to law enforcement relating to LE's involvement in the brandishing of a weapon on May 15, 1995.

f. On or about October 20, 1999, the defendant, CUONG GIA LE, assaulted and threatened several individuals, including Fairfax County police officers who were attempting to arrest LE at the Hoa Kee Restaurant in Fairfax County, Virginia.

g. In or about early April 2001, the defendant, CUONG GIA LE, recruited others to assault and kill a rival gang member.

h. On or about April 7, 2001, the defendant, CUONG GIA LE, and several others fought with numerous individuals at the Hi Cue Billiard Hall, Arlington County, Virginia.

i. In or about late April 2001, the defendant, CUONG GIA LE, planned to kill Hoang Anh Tran. Specifically, LE armed himself with a .38 caliber handgun and went with another person to the Phong Lan Pool Hall in Falls Church, Virginia, for the purpose of killing Tran.

■ On April 7, 2004, the government filed a Second Amended Death Notice, which merely corrected sub-paragraph (g) of Part (c)(2) of the Amended Death Notice by deleting the reference to Hoang Tran, which reference was included in the Amended Death Notice due to a drafting error by government counsel. On April 8, 2004, the government filed a Third Amended Death Notice, which simply corrected the notice to reflect the new count numbers in the Fifth Superseding Indictment, which had issued since the filing of the Second Amended Death Notice. It is clear, therefore, that there have been no significant changes to the Amended Death Notice filed March 19, 2004[5] and therefore, it is the timeliness of that notice that will be addressed here. The question, then, is whether the Amended Death Notice, filed 94 days before the scheduled trial date, was filed in a manner consistent with 18 U.S.C. § 3593(a) and *Ferebe*.

## II.

■ The threshold question is whether the government has shown good cause to file the Amended Death Notice. Section 3593(a) of Title 18 states that a court "may permit the attorney for the government to amend the [death] notice upon a showing of good cause." 18 U.S.C. § 3593(a). It is undisputed that the government did not

5. While Le notes in his pleading that the Second Amended Death Notice made a "substantial" change to the Amended Death Notice filed March 19, 2004, it is clear that while deleting the reference to Hoang Tran is technically a change in the substance of the Notice, it is not a significant change.

attempt to make such a showing *before* filing its Amended Death Notice. Instead, the government waited until after the filing of the Amended Death Notice to attempt to make its case of good cause for the amendment in the briefs and pleadings filed in response to Le's motion to strike the Amended Death Notice. Le argues that this effort comes too late, that it inappropriately puts the cart before the horse. The government counters simply that it is sufficient to show good cause now.

The failure to file a motion for leave to amend the Death Notice setting forth the requisite good cause is at best a procedural misstep, but not a fatal error. This is so because while the statute mandates a showing of good cause, it does not prescribe the procedure by which the showing should be made. Moreover, there is no essential difference between resolving the issue of good cause on the basis of a government motion seeking to establish good cause or a defendant's objection to an amendment noting the lack of good cause. In either event, the government does not escape its obligation to satisfy the statute's good cause requirement. Had the government filed a motion to amend, it would surely have also filed the proposed amendment so as to permit an assessment of the good cause and timeliness issues. Therefore, what occurred in fact is not essentially different from what would have occurred had the government filed a motion for leave to amend the Death Notice. In either case, the government would be required to make a showing of good cause for the amendment. Thus, it is clear that the threshold issue now is whether there is good cause to allow the government here to amend the original Death Notice.

Le argues that the government did not have good cause to amend its original Death Notice because all of the information in the Amended Death Notice was known to the government before the filing of the original Death Notice. The government does not deny this, nor could it plausibly do so given government counsel's representations at a hearing on March 26, 2004. Specifically, government counsel reported that as of March 19, 2004, the Department of Justice ("DOJ") had not yet finally and formally approved the filing of a Death Notice in this case, but had earlier advised government line counsel in this case that a Death Notice could be filed without formal DOJ approval if it became necessary to do so to comply with the Court's schedule. Notwithstanding this authorization, and although the Court had repeatedly urged government line counsel, and through them, the DOJ as well, to expedite the death notice decisional process, government line counsel elected to file no such notice as of February 26, 2004. This decision was presumably based on the United States Attorney's recommendation to the DOJ at that time (and never formally changed) not to seek the death penalty against Le.

February 26, 2004, it appears, was a pivotal date, as according to government counsel, reliable information concerning Le's involvement in the 1997 murder of Long Hung Nguyen became known to the government that day and this information then triggered government line counsel's decision to proceed to file the Death Notice on February 27, 2004, which notice significantly does not refer to Le's involvement in the 1997 murder. Thus, the triggering event for the filing of the Death Notice on February 27, 2004 without final DOJ approval was the government's receipt on February 26, 2004 of reliable information from Thiet Phan—an individual who had actually been convicted of the 1997 murder in Virginia state court—corroborating Le's involvement in the 1997

murder.[6] Given Thiet Phan's corroborating information, government line counsel concluded that the DOJ would now likely reach a decision to require government line counsel to seek the death penalty against Le, notwithstanding the United States Attorney's formal recommendation to the DOJ that the death penalty *not* be sought against Le.

It should be noted, however, that there is record support for the conclusion that the government had reliable information concerning Le's involvement in the 1997 murder as early as February 20, 2004. Thus, in a pleading responding to Le's motion to strike the original Death Notice, the government stated that "[t]he government informally notified the defense of this intention [to file a Death Notice relying on the 1997 murder] on February 20, 2004." This suggests that the government had reliable information concerning Le's involvement in the 1997 murder as early as February 20, 2004—a full week before the original Death Notice was filed. Yet, as noted, the original Death Notice makes no mention of the 1997 murder. Still, the government contends that good cause to amend the Death Notice existed in these circumstances because "there was a significant amount of work to be done before the United States was prepared to make specific allegations about [the 1997] murder and other gang-related crimes in the amended notice," including (1) charging Lam Chau with the 1997 murder in a separate indictment; and (2) interviewing other witnesses, including one witness who implicated Le in the 1997 murder on March 18, 2004. The government also notes that the three-week period between the filing of the original Death Notice and the Amended Death Notice was filled with various other time-consuming matters related to this case, such as pre-trial hearings, obtaining a Fourth Superseding Indictment, filing pleadings, and the taking of grand jury testimony. The question presented is whether these facts constitute the requisite good cause for amending the Death Notice.[7]

The starting point in the analysis is the recognition that the § 3593(a) good cause requirement is distinct from the statute's timeliness requirement, which is elucidated in *Ferebe*. Importantly, *Ferebe* focuses on, and elucidates, the reasonable notice provision of § 3593(a), not the statute's good cause requirement. And while *Ferebe* provides the guidance by which to measure the timeliness of a Death Notice, no published circuit precedent elucidates the § 3593(a) good cause requirement. On principle, however, it is clear that § 3593(a) good cause must focus on the

---

**6.** It is worth noting that February 26, 2004 was not the first time the government had received information implicating Le in the 1997 murder. Government counsel represented to the Court that, as early as January 2003, the government had received information from Lam Chau that Le was involved in the 1997 murder. But government counsel did not consider this uncorroborated information sufficiently reliable to serve as a basis for the filing of a Death Notice. Not until February 26, 2004, when Thiet Phan began cooperating with the government, did the government receive information from Thiet Phan corroborating Lam Chau's statements implicating Le in the 1997 murder.

**7.** Although Le filed a motion for an evidentiary hearing on the good cause issue after the filing of the government's response, there is, in the circumstances, no need for such a hearing. Moreover, despite defense counsel's suggestions to the contrary, it appears likely that an evidentiary hearing would ultimately and inappropriately require putting attorneys for the government under oath and probing their judgments about the timing and reliability of certain information. As a result, Le's motion for an evidentiary hearing must be denied.

diligence of the government in uncovering the new information contained in the Amended Death Notice and the timing of when that information was obtained. Here, as in other legal contexts, absent reasonable diligence, there can be no good cause. *Cf., e.g., Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir.2003) (noting in the context of Rule 16(b), Fed.R.Civ. P., that "[a] finding of good cause depends on the diligence of the moving party"); *Coleman v. Milwaukee Bd. of School Dirs.*, 290 F.3d 932, 934 (7th Cir.2002) (noting that under Rule 4(m), Fed.R.Civ.P., "[g]ood cause means a valid reason for delay, such as the defendant's evading service"); *In re Sheehan*, 253 F.3d 507, 514 (9th Cir.2001) (stating that "at a minimum," good cause under Rule 4(m) "means excusable neglect"); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.1992) (stating that Rule 16(b)'s good cause standard "primarily considers the diligence of the party seeking the amendment ... [i]f [the] party [seeking amendment] was not diligent, the inquiry should end"); *South Carolina Nat'l Bank v. Baker*, 941 F.2d 1207, 1991 WL 157277 (4th Cir.1991) (unpublished) (noting in the context of a motion to set aside an entry of default "for good cause shown" under Rule 55(c), Fed.R.Civ.P., that "[g]enerally, good cause is shown when the movant acts with reasonable promptness to have the default set aside and alleges a meritorious defense"); *Tschantz v. McCann*, 160 F.R.D. 568 (N.D.Ind.1995) (plaintiff's attorney lacked "good cause" to amend complaint after deadline specified in scheduling order because the information sought to be included in the amendment was available to him before the deadline). And, it is equally clear from the text of § 3593(a) that the burden is on the government to show reasonable diligence and hence good cause for

amending the Death Notice. The government has not met that burden here.

It is undisputed that the government knew of Le's involvement in the January 1997 murder long before filing the Amended Death Notice on March 19, 2004. Indeed, it was this very knowledge that spurred the line prosecutors to file the original Death Notice on February 27, 2004, despite not having received final DOJ approval to do so. Yet, in filing the original Death Notice, the government nonetheless elected to omit from this Notice any reference to the January 1997 murder. It is unpersuasive for the government to suggest now that while the evidence it had of Le's involvement in the 1997 murder before the filing of the original Death Notice—an FBI interview with Thiet Phan (himself convicted in Virginia state court for the 1997 murder) in which Phan implicated Le in the 1997 murder—was sufficiently reliable and compelling to lead the line prosecutors to file a Death Notice without final DOJ approval, they nonetheless needed to investigate further before providing Le with notice of their intention to rely on the 1997 murder to support an aggravating factor. If the government knew enough about Le's involvement in the 1997 murder to warrant filing a notice of intent to seek the death penalty against Le, then it should have exercised reasonable diligence in providing this information to Le in the original Death Notice. *Cf. United States v. Ruhe*, 191 F.3d 376, 387 (4th Cir.1999) (a defendant seeking to suppress certain documents admitted into evidence could not show good cause for his delay in seeking to suppress this evidence "given [his] prior knowledge and opportunities to raise the motion").

Nor is the government's assertion that it needed to indict Lam Chau before including the 1997 murder in its Death Notice persuasive. This action appears entirely

irrelevant to the good cause calculus; for this calculus, it matters not when the government elects to indict Lam Chau, but rather when it had reliable information concerning Le's involvement in the 1997 murder. While it is true that the government after February 26, 2004 might have obtained additional information from Lam Chau and others concerning Le's involvement in the 1997 murder, that information either could have been supplied to Le in discovery or could have served as the basis for an amendment of the Death Notice, if timely offered. *Cf. United States v. Bin Laden,* 126 F.Supp.2d 290, 305 (S.D.N.Y. 2001) (finding that the government's proposed amendment of the Death Notice would not "in any way prejudice this defendant's rights since no new aggravating factors are being added" and the government "seeks merely to supplement the notice with further evidentiary detail").

As for the eight other violent incidents first mentioned in the Amended Death Notice, the government makes no persuasive showing at all of good cause for delaying their inclusion in the Death Notice until March 19, 2004. Aside from the general statement that "there was a significant amount of work to be done before the United States was prepared to make specific allegations" about the "other gang-related crimes in the amended notice," the government offers no reasons for not including these incidents in the original Death Notice. Further, the government does not specify the nature and scope of this "significant amount of work to be done" and indeed conceded at the April 28, 2004 hearing that it knew about all eight incidents before filing the original Death Notice on February 27, 2004. Because the

government has made no showing of good cause for its failure to include these incidents in the original Death Notice, it has failed to meet its burden of showing good cause to amend the Death Notice to include these incidents.

Also unavailing is government counsel's argument that the three-week period between the filing of the original Death Notice and the Amended Death Notice was filled with various hearings and other matters related to this case, leaving the two line prosecutors handling the case at that time with little opportunity to file the Amended Notice sooner or to include the nine incidents in the original Death Notice. No doubt the two line prosecutors handling this case were both busy and working long hours during this period.[8] Yet, the government cannot rely on a theory of limited resources to show good cause for delay. In matters of this magnitude, namely death penalty cases, the standard of diligence is high. And if diligence requires the DOJ or the United States Attorney's office to provide additional resources, then those resources should be provided. The absence of diligence on the part of the government as an entity, in other words, should not form the basis for claims of reasonable delay. Otherwise the government could always make a showing of good cause by purposefully under-staffing a case. Had the government provided more staff and resources, it seems clear that the government would have been able to include the nine violent incidents in the original Death Notice. Again, the government admits that it knew about all nine incidents before filing the original Death Notice.[9]

---

8. It is also clear that the line prosecutors did not engage in any purposefully dilatory tactics or strategic delay in filing the Amended Death Notice. They simply did not make this filing

as reasonably promptly as they might have; and none of the reasons cited justify the delay.

9. It is true that government line prosecutors cannot control the bureaucratic delays that

In sum, therefore, the Amended Death Notice must be stricken because the government has not shown good cause to amend the original Death Notice. The matter proceeds, therefore, on the basis of the original Death Notice.

### III.

Although there is an absence of good cause shown for amending the Death Notice, the timeliness of the Amended Death Notice under *Ferebe* is nonetheless addressed for purposes of judicial economy on appeal.

■ The timeliness of a Death Notice is governed by 18 U.S.C. § 3593(a) and the Fourth Circuit's decision in *Ferebe*, 332 F.3d 722. Section 3593(a) states that in cases where the government decides to seek the death penalty, the attorney for the government "shall, *a reasonable time before the trial* or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice." 18 U.S.C. § 3593(a) (emphasis added).[10] The Fourth Circuit's decision in *Ferebe* interprets this statutory provision and sets forth a framework for evaluating whether a Death Notice has been filed a reasonable time before trial. Specifically,

evaluation of the following factors, among others that may appear relevant, is necessary in order to assess the reasonable timeliness of a Death Notice:

> (1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings.

*Ferebe*, 332 F.3d at 737 (internal footnote omitted). With respect to the third factor, the scheduled trial date constitutes the trial date for purposes of this calculation. *Id.* at 737 n. 6.

Thus, the threshold issue in the *Ferebe* analysis is identification of the proper trial date. For the reasons set forth in an earlier memorandum opinion, that trial date is June 22, 2004. *See United States v. Cuong Gia Le*, 311 F.Supp.2d 527 (E.D.Va.2004). Yet, the government disputes this conclusion, arguing that this trial date is no longer fixed in view of the pending, unresolved interlocutory appeals to the Fourth Circuit Court of Appeals concerning the original Death Notice.[11]

---

are apparently inherent in the DOJ's consideration of whether to seek the death penalty in various cases. That these decisions should take time is understandable and the DOJ's internal death penalty authorization process is understandably thorough and time-consuming. Yet, § 3593(a) does not make allowance for bureaucratic delays; it does not provide that timeliness or good cause should be determined in a manner that accommodates the bureaucracy and its procedures. In other words, it is the bureaucracy that must accommodate the statute and not the other way around. In this case, it is significant that the DOJ did not formally authorize the United States Attorney to seek the death penalty against Le until the last week of April 2004.

**10.** This notice must (1) state that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified and that the government will seek such a sentence; and (2) set forth the aggravating factor or factors that the government proposes to prove as justifying a sentence of death in the event that the defendant is convicted. *See* 18 U.S.C. § 3593(a).

**11.** Specifically, on March 5, 2004, Le filed a notice of interlocutory appeal of this Court's February 24, 2004 Order denying his motion to bar and/or strike the government's Death Notice. In addition, on April 6, 2004, Le filed a notice of interlocutory appeal of this Court's March 29, 2004 Order denying his motion to strike the government's original Death Notice.

As a result of these appeals, the government argues that, as a practical matter, the June 22, 2004 trial date is not "fixed" within the meaning of *Ferebe*.

This argument fails to persuade. *Ferebe*, closely read, reflects that uncertainty over the trial date had nothing to do with any uncertainty with respect to the effect of the appeal on the trial date. Contrary to the government's suggestion, the Fourth Circuit did not remand the *Ferebe* case to the district court to determine whether a scheduled trial date existed because the appeal, as a practical matter, may have delayed the trial. The reason the Fourth Circuit was unable to determine the period of time remaining before trial in *Ferebe* was that, although a trial date had been set, the district court's *own words* "cast doubt on whether that date remained fixed." *Ferebe*, 332 F.3d at 738. More specifically, it was the district court's comments about the effect of a conditional plea agreement on the scheduled trial date that left the Fourth Circuit in *Ferebe* unable to determine the time remaining before trial at the instant the Death Notice was filed. *Id.* No such obstacle exists here. At the instant the government filed its Amended Death Notice, trial was (and remains) scheduled to commence on June 22, 2004. In addition, if accepted, the government's argument would unfairly penalize a capital defendant for exercising his right to pursue an interlocutory appeal of a district court's order denying his motion to strike the government's Death Notice. *See id.* at 726 ("[D]istrict court orders denying motions to strike Death Notices as untimely filed are immediately appeal-

able."). Put differently, the government's argument, if accepted, would frustrate any *Ferebe* analysis on appeal because that appeal would render any trial date uncertain. Thus, the defendant's interlocutory appeals do not affect the fixed trial date in this case. Given this trial date, the question presented is whether the Amended Death Notice was filed a reasonable time before June 22, 2004.

The principles announced in *Ferebe*, applied here, lead to the conclusion that the government did not file its Amended Death Notice a reasonable time before trial. At the instant the government filed its Amended Death Notice on March 19, 2004, trial was (and remains) scheduled to begin on June 22, 2004. Thus, the period between the filing of the Amended Death Notice and trial is 94 days.

Because the previous memorandum opinion already resolved Le's motion to strike the government's original Death Notice and it was there determined that the legal and factual issues presented by the capital charges in the indictment did not appear " 'so complex or atypical' that 113 days [12] would be an unreasonably short period of time to prepare a defense," [13] it is clear that the first *Ferebe* factor need not be addressed again here for the capital charges against Le remain the same. As a result, 113 days remains an objectively reasonable time under the circumstances for Le to prepare a defense to those charges.

The nature of the aggravating factors provided in the Amended Death Notice,

On April 16, 2004, the Fourth Circuit consolidated these appeals for purposes of briefing and oral argument.

**12.** This figure, 113 days, represents the Court's calculation of the proper period of time for determining whether the original

Death Notice was timely. *See Le*, at 532–34. Because the capital charges in the indictment have not changed, 113 days remains the relevant period of time for an evaluation of the first *Ferebe* factor.

**13.** *Le*, 311 F.Supp.2d at 533.

however, differ significantly from those in the original Death Notice. Most important to the analysis here, under the newly-identified non-statutory aggravating factor titled "history of violence," the government identifies for the first time nine violent incidents in which Le has allegedly been involved and on which the government intends to rely in arguing that Le should be sentenced to death if convicted. *See supra* pp. 345–46. These nine new allegations significantly alter the legal landscape and require a new *Ferebe* analysis. In evaluating the original Death Notice, this Court made clear that:

> [A]ll of the aggravating factors listed in the first Death Notice specifically relate back to the capital offenses Le is charged with in the Fourth Superseding Indictment, namely the murders of Binh Anh Luu and Long Phu Nguyen. As a result, these aggravating factors require no additional investigation on the part of the defense for the purposes of any potential death penalty phase of trial, as an investigation into the facts and circumstances of charges in the indictment would undoubtedly take place in any event in preparation for Le's defense to these capital charges during the guilt phase of trial.

*Le,* at 535. In stark contrast, the government now alleges nine new criminal incidents which it believes justify a sentence of death. The government will have the burden of establishing these new aggravating factors "beyond a reasonable doubt." 18 U.S.C. § 3563(c). And defendant will have the burden of establishing the existence of any mitigating factors, including any possible factors implicated by the nine new allegations, "by a preponderance of the evidence." *Id.* To effectively prepare for any potential sentencing hearing and to refute these new allegations, defense counsel will need to investigate these allegations thoroughly.

This is no small task, especially as one of the new allegations (violent incident "c") essentially amounts to yet another murder charge against Le. The government itself concedes that this incident "will require considerable time to investigate." [14] If anything, this qualitative concession is an understatement for the inclusion of violent incident "c" essentially imports a second capital murder trial into the penalty phase of this case. Given the enormous potential significance of this particular aggravating factor, it is reasonable to assume that defense counsel will wish to leave no stone unturned investigating Le's involvement in the 1997 murder. It is hard to see how this task could be reasonably concluded in barely three months given that both defense counsel must also prepare to defend against the capital charges and 16 other non-capital charges in the guilt phase of the trial. It is simply not reasonable to conclude that 94 days is sufficient for defense counsel to complete these tasks effectively. Nor is this inconsistent with the *Ferebe* findings made with respect to the original Death Notice in this case. The conclusion that 113 days is reasonable time to prepare a defense to the murders alleged in the indictment, as well as the non-capital offenses, does not by any means indicate that 94 days is sufficient to prepare to defend a second murder trial when those 94 days are included in the 113.

Nor is this conclusion contradicted or undermined by the fact that the 1997 mur-

---

**14.** In this respect, it should be noted that before the Amended Death Notice was filed, neither Thiet Phan nor Lam Chau were "players" that needed to be investigated in this case. Additionally, it is clear that any investi- gation of the new incidents alleged in the Amended Death Notice will likely be hindered by language and cultural barriers, rendering investigation significantly more complicated and laborious.

der was the subject of a trial against Thiet Phan in Arlington County, Virginia and that the government intends to rely on the record of that trial, along with the testimony of approximately six witnesses and certain unspecified exhibits, to prove this allegation during the penalty phase of trial. If anything, this underscores the breadth and depth of the investigation the defense must undertake to defend against this murder charge.

■ Although the government conceded that the addition of the 1997 murder would require considerable time to investigate, it argues that this is the only incident alleged in the Amended Death Notice requiring considerable investigation. It may well be that a 94 day period is reasonable time for a defendant to investigate some or all of the incidents other than the 1997 murder. But that is not the question presented. Here, defense counsel must investigate all nine incidents and they must do so while also preparing to defend Le against the capital charges in the indictment. In any event, it is by no means clear that the other eight violent incidents alleged in the Amended Death Notice do not also require considerable investigation. While some of these incidents appear to have been the subject of unspecified "arrests and/or court proceedings," it does not appear that Le has ever been convicted of, or tried for, any of these alleged violent incidents. Therefore, it is not reasonable to assume that only minimal or virtually no investigation of these incidents would be required. To the contrary, it is clear that all of these incidents will require significant investigation by the defense. And while the government may only intend to call one or two witnesses to testify about each of the other eight incidents, defense counsel's investigation of these incidents may ultimately lead them to call additional witnesses to defend Le against these serious charges, which include various shootings, assaults, and what appear to be charges of attempted murder.

In sum, where, as here, an Amended Death Notice imports into the trial nine additional incidents of violent conduct, including an additional murder, and where the investigation of these charges must necessarily occur simultaneously with the investigation and litigation regarding the murders and other crimes alleged in the indictment, 94 days is not sufficient time to prepare. Le is charged with twenty (20) counts in the Fifth Superseding Indictment, including charges alleging Le's direct involvement in five violent incidents and his participation in a conspiracy whose members committed eight other violent robberies. Quite simply, in these circumstances, 94 days is not a reasonable period of time before trial for Le to investigate adequately nine new allegations of criminal misconduct, including a serious charge of murder, to prepare for a phase of trial that will determine whether he lives or dies.

The filing of the Amended Death Notice also alters the analysis of the status of discovery in these proceedings as the nine new allegations undoubtedly require more discovery. While the government proffers in its April 16, 2004 pleading that "it will provide [defense] counsel with copies of all documents relating to the amended notice," and this has now occurred,[15] it remains the case that discovery on the nine newly-alleged incidents is ongoing and that at least some discovery on the new allegations has not yet occurred. Even if discovery were complete, however, the nature,

---

**15.** This proffer was implemented the week of April 19, 2004 and on April 27, 2004. Thus, provision of these documents to defense counsel did not occur until late April—approximately one month after the government filed the Amended Death Notice. By this time, the period remaining before the scheduled trial date had dwindled to about two months.

seriousness, and number of the new allegations in the Amended Death Notice are themselves a sufficient basis to conclude that the government did not file its Amended Death Notice a reasonable time before trial, as required by § 3593(a) and *Ferebe*.[16]

## IV.

Accordingly, because the government did not have good cause to amend its original Death Notice and because, in any event, the government's Amended Death Notice was untimely under *Ferebe*, Le's Motion to Strike the Government's Amended Notices of Intent to Seek the Death Penalty must be granted, and the government's Amended Death Notices dated March 19, 2004, April 7, 2004, and April 8, 2004 respectively stricken.

An appropriate order will issue.[17]

16. Not addressed here is whether any of these nine incidents might be properly admissible as either intrinsic to the offenses charged in the indictment or as Rule 404(b) evidence that passes muster under Rule 403, Fed.R.Evid. It appears that the government believes that incidents (g), (h), and (i) are intrinsic and it has not made any decision on whether it will offer any of the other incidents under Rule 404(b), Fed.R.Evid. It is worth noting, however, that with respect to the 1997 murder, and perhaps others of the alleged incidents, the conclusion reached here that 94 days is not sufficient time to prepare may bear significantly on the Rule 403 unfair prejudice calculus.

17. It is worth noting, of course, that nothing in this opinion is intended to address or affect in any way the government's ability to prosecute Le independently for the January 1997 murder in a separate prosecution.