[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 20, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-12694

_____

D. C. Docket No. 04-60216-CR-JIC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KENNETH WILK,
a.k.a. Kenneth P. Wilk,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 20, 2006)**

Before DUBINA and HULL, Circuit Judges, and RESTANI[*], Judge.

HULL, Circuit Judge:

---

[*]Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

Appellant Kenneth Wilk ("Wilk") appeals the district court's denial of his motion to strike the government's Notice of Intent to Seek the Death Penalty (the "Death Notice") and to bar the government from seeking the death penalty in his trial for the murder of Deputy Sheriff Todd M. Fatta ("Fatta") and other charges. Wilk asserts that the Death Notice was not provided to him "a reasonable time before the trial" as required by 18 U.S.C. § 3593(a). After review and oral argument, we affirm, concluding that a Death Notice filed six months before the trial is reasonable notice under § 3593(a).

## I. BACKGROUND

### A. Fatta's Murder

In the summer of 2001, Wilk's domestic partner, Kelly Ray Jones ("Jones"), was arrested and convicted on child pornography charges. Jones was sentenced to twenty-eight months' imprisonment and three years of supervised release. A condition of Jones's supervised release was that he not use the Internet. During Jones's prosecution, Wilk made threats to law enforcement personnel, some of which he made online under his computer screen name "Wolfpackeines." Wilk's online profile listed hobbies such as "hunting cops" and occupations such as "cop bashing" and "alerting people about kiddy porn stings." Around this time, Wilk purchased several firearms and participated in firearm skill shooting contests

2

throughout Florida. Wilk purchased additional firearms in 2002 and 2003, including a Winchester 30-30 rifle.

On July 12, 2004, while on supervised release, Jones sent images depicting child pornography to an undercover law enforcement officer from Wilk's Internet account on a computer at a residence shared by Jones and Wilk. On July 15, 2004, as a result of further investigation, police obtained a search warrant, searched the residence, recovered numerous child pornography images, and arrested Jones on the scene.

While Jones was incarcerated, he instructed Wilk to contact a witness whom the police told Jones not to contact. Wilk went to the witness's apartment and told him that, even if the witness cooperated, the witness would still have to serve prison time. At Jones's direction, Wilk sent derogatory emails to the witness's business associate in an attempt to discredit the witness. Further communication between Jones and Wilk suggested that Wilk planned to threaten or kill a witness against Jones. Also at Jones's instruction, Wilk deleted emails relevant to Jones's child pornography charges.

Following these events, federal agents obtained an arrest warrant for Wilk and a search warrant for his residence. Agents initially planned to use a ruse to lure Wilk from the residence, but abandoned the idea after learning that Wilk

anticipated such a tactic. On August 19, 2004, Fatta and Sergeant Angelo Cedeno ("Cedeno"), both of the Broward County Sheriff's Office, assisted federal agents, including Immigration and Customs Enforcement Special Agent Christopher Harvey, in the execution of the warrants. After surrounding the residence and announcing themselves, the officers forcibly entered.

Upon entry, two large caliber gunshots were heard, followed by several smaller caliber gunshots. At that point, Cedeno was injured from the shooting, and Wilk appeared at the open front door. Wilk complied with officers' demands to surrender and was arrested. A gun was found in the front doorway from which Wilk exited the residence. Inside the residence, Fatta was found shot on the floor and did not appear to be breathing. Despite attempts to revive him, Fatta subsequently died. Other than Wilk, no one else was found in the residence.

The next day, on August 20, 2004, the district court appointed J. Rafael Rodriguez, who has extensive experience in capital crimes litigation, to represent Wilk. On August 26, 2004, Wilk and Jones were indicted jointly in a five-count indictment that charged them with child pornography and witness and evidence tampering offenses.[1] On September 1, 2004, Wilk was arraigned on this initial

---

[1]Counts 1, 2, and 5 charged Wilk and Jones with conspiracy to possess child pornography, possession of child pornography, and witness and evidence tampering, respectively. Counts 3 and 4 were against Jones alone and charged him with two counts of distribution of child pornography.

indictment, and on September 2, 2004, the district court set a trial date of November 1, 2004, on the five-count indictment. As detailed below, the capital murder charges in this case were added later.

On September 22, 2004, Wilk made a presentation to the United States Attorney's Office in Florida regarding the propriety of capital punishment in this case in connection with Fatta's murder.[2] A meeting on the matter with the Capital Case Unit of the Justice Department was scheduled for October 18, 2004, in Washington, D.C.[3]

## B.   October Status Conferences

From the start, this case was considered a potential death penalty case. At a status conference on October 8, 2004, the government stated that it might seek the

---

[2]The Attorney General must authorize any federal death penalty prosecution. U.S. Attorneys' Manual § 9-10.020. "In any case in which a United States Attorney's Office is considering whether to request approval to seek the death penalty, the United States Attorney shall give counsel for the defendant a reasonable opportunity to present any facts, including any mitigating factors, to the United States Attorney for consideration." Id. § 9-10.030. After the U.S. Attorney decides to seek authorization for the death penalty, he must submit a Death Penalty Evaluation form and a prosecution memorandum to the Department of Justice in Washington, D.C., which is processed by the Capital Case Unit. Id. § 9-10.030-.040. Defense counsel is also provided the opportunity to present facts to the Capital Case Unit when the Unit considers whether to authorize the death penalty in the case. Id. § 9-10.050. The Attorney General then makes the final decision authorizing the U.S. Attorney to seek the death penalty. Id.

[3]The meeting was rescheduled for November 1 and later postponed until December 13. Defense counsel made presentations in Florida and Washington, D.C. arguing, among other things, that the government should not seek the death penalty against Wilk because he had a disease and was dying in any event.

death penalty in a forthcoming superseding indictment. The magistrate judge

suggested that a continuance of the November 1 trial date was probably necessary.

On October 15, 2004, Wilk moved to continue the November 1 trial, citing

outstanding discovery issues and the possibility that Wilk would be charged with a

capital offense. On October 20, 2004, the district court granted Wilk's motion and

continued the trial until December 13, 2004.

Also on October 20, 2004 and on the ex parte request of Wilk's counsel, the

magistrate judge appointed William Matthewman, who is qualified to handle death

penalty cases, as Wilk's second counsel pursuant to 18 U.S.C. § 3005 and due to

the probability of this becoming a capital case. Additionally, the district court

granted funds for an investigative firm and mitigation specialist so that Wilk could

prepare for a death penalty trial.[4]

On October 21, 2004, the grand jury returned a six-count superseding

indictment against only Wilk charging him with the same possession of child

pornography and witness and evidence tampering offenses in the prior indictment

and adding counts for: (1) the malice murder of Fatta, while he was assisting a

federal officer engaged in official duties, designated as a capital count; (2) the

attempted murder of Cedeno; (3) the use of a firearm during the murder and

---

[4]Because various ex parte motions remain under seal, we do not identify the names of the persons or the tasks Wilk sought funds to have performed.

attempted murder, designated as a capital count; and (4) obstruction of justice in connection with Jones's prosecution.[5] The superseding indictment also referenced 18 U.S.C. §§ 3591(a)(2)(A)-(D) and 3592(c), which set out the statutory aggravating factors required to impose the death penalty, and then listed the charged statutory aggravating factors in this case as: (1) Wilk was over the age of eighteen; (2) Wilk intentionally killed Fatta; (3) Wilk knowingly created a grave risk of death to one or more persons in addition to Fatta; (4) Wilk committed the murder after substantial planning and premeditation; and (5) Wilk intentionally killed or attempted to kill more than one person in a single criminal episode. On October 28, 2004, Wilk was arraigned on the superseding indictment.

## C.    October 28, 2004, Conferences

At an October 28 status conference before the district court, Wilk requested a continuance of the December 13 trial and waived his right to a speedy trial.[6] Wilk stated that a continuance was necessary due to outstanding discovery issues and a December 13 meeting with the Department of Justice Capital Case Unit regarding whether the government would seek the death penalty.

The government opined that the case was not complicated, but

---

[5]The superseding indictment omitted the conspiracy to possess child pornography count charged in the first indictment.

[6]It is not clear whether Wilk waived his speedy trial rights under the initial indictment or the superseding indictment.

7

acknowledged that Wilk's mental status was a potentially complicating matter. The government suggested a May trial date because it believed that discovery would have been complete by then and a decision would have been made about seeking the death penalty. The government estimated that it would deliver its discovery materials to the defense by the following week.

Wilk outlined the outstanding discovery issues, including access to Wilk's residence, review of conversations between Wilk and Jones, and review of police reports and 911 recordings. Wilk also expressed his need to procure experts for the guilt and penalty phases and to allow them time to analyze the evidence. Wilk then expressed his frustration with the fact that he did not have access to his residence for investigative purposes and noted that he was currently preparing for the upcoming meeting with the Department of Justice regarding the death penalty in this case. Wilk opined that the defense could not be ready by May 2005 due to its need to prepare, especially if the government opted to seek the death penalty.

The district court reset the trial date from December 13, 2004 to April 18, 2005. Wilk objected to the April 18 trial date, believing that there was no "way we can be ready for a potential death penalty case by that time." The district court overruled the objection, noting that Wilk's two counsels were qualified and experienced with trying capital cases, that an April 18 trial was over five months

8

away, and that the case was not complex.

At a separate status conference on October 28, 2004, the magistrate judge addressed discovery deadlines. Wilk again expressed his dissatisfaction with the April 18 trial date, indicating that counsel would not be ready for trial by that time. Wilk's counsel expressly stressed that the case was a "potential capital case[.]"

## D. November and December Conferences

At a November 12, 2004, status hearing, the magistrate judge addressed the status of discovery. The government stated that its discovery material was available for Wilk at the copiers, but additional materials, such as DVDs and CDs containing evidence, were still being prepared. The parties then discussed who would pay for the duplication costs. That same day, Wilk filed ex parte motions for four defense experts. The magistrate judge granted funding for the experts on December 28.

At a December 2, 2004, status conference, the government stated that the discovery issues were proceeding properly and that it had sent a second set of materials to the copiers. Wilk noted that a motion to compel some additional discovery materials from the government may be necessary depending on what was already at the copiers. Wilk's counsel noted that the case was a "potential capital case" and expressed the "need to prepare, not only for the [December 13]

9

DOJ meeting, but also for [the April 18] trial and any death penalty issues." Also on December 2, Wilk filed an ex parte motion for a fifth expert, which the magistrate judge granted on January 31, 2005. On December 21, Wilk filed ex parte motions for his sixth and seventh experts, which the magistrate judge granted on January 31, 2005.

### E.    January Conferences

At a January 5, 2005, status conference, the parties addressed a dispute regarding access to Wilk's house and the collection of physical evidence there. Wilk wanted to remove certain items from the residence to prepare for trial, but the government opposed the removal without a formal accounting of the items. Also on January 5, Wilk filed an ex parte motion for additional investigative fees for travel to interview relevant witnesses in preparation for the penalty phase. Additionally, he filed a motion for his eighth expert. The magistrate judge granted the motions on February 4 and 24, respectively.

On January 28, 2005, the district court held another status conference. The government stated that it had made a presentation in December in Washington, D.C. regarding the death penalty in Wilk's case, but that the Attorney General would not make a decision until February 25 because the new Attorney General had not been confirmed yet. The district court noted that a Death Notice must be

filed a reasonable time before trial.

In this regard, 18 U.S.C. § 3593(a) provides that in a capital case the government shall, "a reasonable time before the trial," file with the district court and serve on the defendant notice that the death penalty is justified and list the aggravating factors justifying a death sentence. During the status conference, the government contended that filing a Death Notice as late as February 25, 2005, for the April 18 trial was "a reasonable time before the trial" under § 3593(a) because (1) Wilk already had a second defense counsel appointed in October 2004 in anticipation of the death penalty, and (2) the district court already had conducted ex parte hearings regarding Wilk's retention of experts and mitigating aspects relating to the death penalty.

Wilk explained that, assuming the Death Notice was filed on February 25, defense counsel still would not be ready for a capital case by April 18 and the notice would not be reasonable under § 3593(a). Wilk argued that the fact that two lawyers had been appointed was not relevant and that a reasonable time for filing the notice was six months before trial. The district court stated that "it would probably behoove the defendant to assume that the government will be seeking the death penalty."

Given that the statutory aggravating factors were already listed in the

11

October 21 superseding indictment, the government also agreed to provide Wilk with a list of non-statutory aggravating factors for seeking the death penalty within ten days so that Wilk would not be hampered in the preparation of his defense should the Attorney General authorize the death penalty.[7] Wilk objected to the procedure, arguing that a February Death Notice could not be reasonable with respect to an April trial date. When the district court inquired how Wilk would be prejudiced if he already was appraised of the statutory and non-statutory aggravating factors, Wilk responded that prejudice was irrelevant as § 3593(a) required strict compliance.

At the January 28, 2005, conference, the district court confirmed that the trial was set for April 18, 2005, and ordered the government to file a Death Notice by February 18, which would provide the Attorney General sufficient time to review the case. The parties then extensively discussed the jury questionnaire, which, over Wilk's objection, included questions regarding capital punishment.

F.    **February Conferences**

On February 2, 2005, Wilk filed an ex parte motion for his ninth expert, which the magistrate judge granted on March 9, 2005. On February 4, Wilk filed another ex parte motion for additional funds for the mitigation specialist and

[7]The government provided the non-statutory aggravating factors to the defense via letter on February 4, 2005.

12

investigative firm already working on the penalty phase. The magistrate judge granted the motion on March 9.

At a February 10, 2005, status conference, the government acknowledged the February 18 deadline to file the Death Notice and explained that the Attorney General was still reviewing the case. Wilk stated that he would file most of his motions by the February 14 motions deadline, but requested additional time for some motions in light of the February 18 Death Notice deadline. Wilk's counsel stated that "as of now the case is not a capital case" and advised the magistrate judge that "a whole new range of motions and a whole new range of issues" would arise should the government file a Death Notice. The government responded that it had intended to seek approval for the death penalty from the beginning of the case. The magistrate judge explained that Wilk should treat the case as a death penalty case and indicated that the April 18 trial date was firm and fast approaching. The magistrate judge also expressed reservations about extending the motions deadline, but allowed Wilk until February 16 to file his motions.

On February 16, 2005, Wilk's two counsels filed these thirty-nine motions: (1) thirteen motions to dismiss various counts of the superseding indictment on grounds such as failure to state a crime, unconstitutionality of the underlying criminal statute, duplicity and multiplicity, lack of jurisdiction, vagueness,

13

governmental delay, and insufficient commerce clause nexus; (2) a motion for production of legal instructions provided to the grand jury; (3) a motion for a pretrial hearing to determine the existence of a conspiracy, the admissibility of alleged conspiratorial statements, and to exclude alleged co-conspirator hearsay; (4) a motion to bifurcate the forfeiture count; (5) a motion for early Jencks Act disclosure; (6) a Federal Rule of Criminal Procedure 12(b)(4)(B) motion for notice by the government of its intention to use evidence in its case-in-chief; (7) a motion for change of venue based on prejudicial pretrial publicity; (8) two motions for a bill of particulars, one each on the obstruction of justice and child pornography counts; (9) a motion to strike the statutory aggravating factors from the superseding indictment; (10) a motion to strike "surplusage" from the superseding indictment; (11) a motion to sever the counts; (12) a motion to suppress the phone calls between Wilk and Jones; (13) nine motions in limine regarding pretrial lineups, bankruptcy cases, 911 and fire rescue tapes, conversations between Wilk and Jones, past searches and seizures at Wilk's residence, Jones's guilty plea, Wilk's "perp walk" and mug shots, and other crimes evidence; (14) a motion to exclude the government's expert witnesses; (15) a motion to suppress fruits of the search warrant executed on August 19, 2004; (16) a motion to suppress Wilk's medical and psychiatric records; (17) a motion to suppress Wilk's post-arrest

14

statements; and (18) a motion to compel discovery.

On February 18, 2005, the government filed a formal Death Notice based on the malice murder of Fatta and the use of a firearm resulting in Fatta's death.[8]  The statutory aggravating factors listed in the Death Notice were identical to those listed in the superseding indictment filed on October 21, 2004.  The Death Notice also listed the following non-statutory aggravating factors under 18 U.S.C. § 3593(a)(2): (1) Wilk killed Fatta in an attempt to obstruct justice; (2) Wilk may be convicted contemporaneously of charges in addition to the capital charges; (3) Wilk was a danger to others; and (4) Wilk caused injury and harm to Fatta's family by killing Fatta.[9]

At a February 24, 2005, status conference, the magistrate judge scheduled hearings commencing on February 28 primarily for Wilk's suppression motions and noted that she would hear oral argument on all the motions if Wilk desired. The government expressed its intent to file a second superseding indictment to add an additional capital count relating to Fatta's murder.  Wilk's defense counsel stated they had a "slew of additional motions" to file regarding the Death Notice.

---

[8]Although the notice was postmarked February 22, 2005, defense counsel did not receive a copy until February 24, 2005.  The government explained the disparity as a result of the Presidents' Day holiday.  Wilk was never personally served with a copy of the notice.

[9]We could not locate in the record the letter, referenced at the January 28, 2005, status conference, listing the non-statutory aggravating factors, and, thus, we do not know if Wilk had already been advised of these factors.  See supra note 6.

15

The magistrate judge responded that she had previously warned the defense to treat the case as a capital case and to file all motions accordingly, but nevertheless allowed additional motions to be filed by March 11. The magistrate judge heard motions arguments on February 28, March 2, and March 9.

## G. March Motions

On March 8, 2005, Wilk filed a motion to strike the Death Notice filed on February 18. On March 10, 2005, the government filed a seven-count second superseding indictment, which retained the six counts from the first superseding indictment and added a third capital count charging Wilk with the murder of Fatta, a state law enforcement officer, while Fatta was working with a federal officer in furtherance of a federal investigation. The statutory aggravating factors listed in the second superseding indictment were identical to those listed in the Death Notice and the first superseding indictment.[10]

On March 9, 2005, Wilk filed an ex parte motion for his tenth expert. The magistrate judge granted the motion on April 20.

On March 11, 2005, Wilk filed three separate motions to declare the Federal Death Penalty Act unconstitutional, inter alia, (1) because of its unconstitutional use, authorization, and treatment of aggravating factors and its failure to provide a

---

[10]Neither the first nor the second superseding indictment included the non-statutory aggravating factors, but the Death Notice did include them.

16

standard for jurors to employ in balancing aggravating and mitigating factors; and (2) in light of Ring,[11] Crawford,[12] and Booker.[13]

Also on March 11, Wilk filed a motion to extend the time for filing motions, arguing, among other things, that the government had filed only partial expert witness disclosures, the government had not provided all discovery, and the defense had not had time to review the second superseding indictment. The magistrate judge granted Wilk's motion and extended the motions deadline to March 18. Following Wilk's motion for reconsideration of the motions deadline, the district court extended the deadline to March 30.

On March 15, 2005, Wilk filed an ex parte motion for his eleventh expert, which the district court granted, in an abundance of caution, on April 20, 2005, over the magistrate judge's denial.

Also on March 15, the government moved for leave to file an amended Death Notice to include the additional capital murder count contained in the second superseding indictment. The statutory and non-statutory aggravating factors listed in the proposed amended Death Notice were identical to those found in the initial Death Notice. The district court granted the motion, noting that the amended

---

[11]Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002).

[12]Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004).

[13]United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005).

17

Death Notice was identical to the prior notice except for the addition of language relating to the new capital murder charge in the second superseding indictment.

On March 25, in addition to a motion to adopt his motions on the first superseding indictment for the second superseding indictment, Wilk filed these motions relating to the second superseding indictment: (1) seven motions to dismiss various counts of the second superseding indictment on grounds such as duplicity, multiplicity, due process and double jeopardy, violation of the Grand Jury clause and other irregularities, failure to state a crime, lack of jurisdiction, and improper delay; (2) a motion to "trifurcate" jury deliberations; (3) a preliminary Daubert[14] motion to exclude the government's expert witnesses; and (4) a motion to dismiss the second superseding indictment due to violation of Wilk's speedy trial rights.

On March 31, 2005, Wilk filed a motion to strike the amended Death Notice and a motion for an immediate ruling on that motion.

## H.     March 30, 2005, Conference

On March 30, 2005, the district court held a status conference to discuss the pending motions.  Wilk himself was not present.  The district court had received the magistrate judge's reports and recommendations and expected to receive

---

[14]Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).

transcripts of the pretrial motions hearings before the magistrate judge by April 11. The district court explained that it would issue orders on the motions "shortly thereafter." The parties discussed evidentiary issues as to their expert witnesses. The government did not believe a hearing on the government's experts was needed, as the experts would testify on non-controversial topics such as ballistics and reconstruction of the crime scene. Wilk disagreed, stating that he had just received the material upon which the government experts relied and needed to provide it to defense experts for review, which would take time. The district court made the week prior to the April 18 trial available for a hearing on the government experts and informed the parties that completed jury questionnaires were available.

The government expressed its concern that it may not be ready for trial on April 18 due to outstanding discovery and expert witness issues. The government opined that it could be ready, but believed that discovery issues still were developing. The government pointed to Wilk's potential mental health defense, noting that it would involve "some pretty intricate and complex expert testimony[,]" and stated that Wilk had not yet disclosed his experts on the matter. In light of Wilk's possible mental health defense, the government anticipated the need to have its own expert examine Wilk, which, under the time frame presently in place, would have to occur while the April 18 trial was proceeding.

19

The government believed a late summer or fall trial would provide Wilk with sufficient time to prepare. Wilk blamed the government for delay in disclosing various discovery materials; pointed out that he had to seek court approval for his experts, a time-consuming process; asserted that the defense was working as quickly as possible with the April 18 trial date in mind; noted that the guilt and penalty phases of a capital case were inextricably intertwined; and asked the district court "to consider these issues very carefully before it decides to go forward on the April 18th trial date."

The district court did not believe the government had intentionally delayed discovery or even been dilatory in the least but reluctantly concluded that a continuance was necessary because it was "better to err on the side of delaying the trial and giving the defendant more time in which to prepare the defense." Without waiving any of his arguments, Wilk suggested the day after Labor Day as the new potential trial date. The district court selected August 29, 2005 as the new potential trial date. The government inquired as to whether the additional time would be excludable under the Speedy Trial Act. Wilk's counsel could not respond to the proposed continuance or the exclusion of time for Speedy Trial Act purposes because Wilk was not present, but then opined that the proper procedure was to strike the Death Notice and proceed to trial on April 18. The district court

20

scheduled another status conference for April 1 so that Wilk could be present.

## I.    April 1, 2005, Conference

At the April 1, 2005, status conference, Wilk stated that he was prepared to go to trial on April 18 if the district court granted his motion to strike the Death Notice. If the district court denied the motion to strike, Wilk would file an interlocutory appeal to this Court and move the district court to stay the proceedings. Wilk conceded that the time during his interlocutory appeal would be excludable under the Speedy Trial Act.

The government believed that Wilk was "extorting" the district court and pointed out that the district court could find time excludable under the Speedy Trial Act in light of Wilk's refusal to take a firm position on the proposed continuance of the trial date to August 29. The government believed that Wilk's new statement that he was prepared for a non-capital trial on April 18 was inconsistent with his repeated requests for continuances and the outstanding discovery matters.

Wilk responded that different trial strategies would be employed depending on whether the Death Notice was in effect. Wilk asserted that he was not trying to exploit the district court, but wanted a ruling on the Death Notice before he was asked to waive his right to a speedy trial. The district court did not want to rule on Wilk's motion to strike the amended Death Notice until the government had

21

responded.

Ultimately, the district court concluded that both sides needed additional time to prepare for trial, stating:

> [i]t's apparent to the Court based on the argument made by [the government], and based on the numerous submissions by Counsel for the Defense that both sides need additional time to properly prepare this case for trial. I am very stingy, as you know, about granting a continuance but the bottom line is justice.
> I am thoroughly convinced that the interest of justice served by a continuance far outweighs any interest of the public and the Defendant in a speedy trial. So as much as I hate to continue this case because, I can tell you it's wrecking [sic] havoc with my schedule, I am going to continue this case until August the 29th.

## J.     Order Denying Wilk's Motion to Strike the Death Notice

On April 27, 2005, the district court entered a twenty-one page order denying Wilk's motion to strike the Death Notice. The district court analyzed the timeliness of the Death Notice under the factors listed in United States v. Ferebe, 332 F.3d 722, 737 (4th Cir. 2003).[15] See United States v. Wilk, 366 F. Supp. 2d 1178, 1182-83 (S.D. Fla. 2005). First, the district court concluded that the August 29th trial date should be used in its timeliness analysis because the trial date was continued for reasons unrelated to the filing of the Death Notice. Id. at 1183. As

---

[15]The factors include: "(1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings." See Ferebe, 332 F.3d at 737.

22

reasons for using the August 29 trial date, the district court pointed to the issues raised at the March 30 and April 1 status conferences, including the numerous unresolved motions; the fact that Wilk had not yet disclosed his experts; and the potential for a Daubert hearing on the government's experts on April 11, one week before the April 18 trial date. Id. at 1183-84.

Second, the district court found that the Death Notice was filed a reasonable amount of time before trial because over six months existed between the filing of the Death Notice and the August 29th trial date. Id. at 1185. The district court further determined that even if it were to use the April 18th trial date, the Death Notice was filed "a reasonable time before the trial" because the district court had given the government until February 18 to file the Death Notice and the district court "set this deadline because it found it would provide Defendant notice of the government's intent to seek the death penalty a reasonable amount of time before trial." Id.

Third, as to the nature of the charges, the district court found that "[t]he homicide charges are rather basic; only the obstruction of justice and pornography allegations, which form part of Defendant's intent, involve any degree of intricacy. Thus, two months, let alone six months, would be sufficient time to prepare a defense." Id. at 1186. The district court also determined "that the government did

23

not intentionally delay in filing the Death Notice." Id.

Fourth, the district court found that "the aggravating factors merely track the [death penalty] statute's language and are reflective of the same facts that are in the homicide charges themselves." Id. at 1187. The district court determined that the defendant "could have adequately prepared his death defense in two months, let alone six, given the nature of the aggravating charges and the prior notice provided in the first Superseding Indictment . . . ." Id. The district court further concluded that there was nothing to suggest that the government should have filed the Death Notice sooner. Id.

Fifth, as to the status of discovery, the district court found "that discovery will undoubtedly be completed long before the August 29 trial date." Id. Even with the April 18 trial date, the district court determined that this factor did not weigh in Wilk's favor enough as to outweigh the other factors. It noted that Wilk "had yet to disclose any defense experts or produce any mental health evidence even though [Wilk] had consulted at least a dozen experts." Id.

Finally, the district court also relied on the fact that the government included a list of statutory aggravating factors in the first superseding indictment in October 2004, even though it was not required to do so. Id. at 1187-88. Because the timeliness of a Death Notice is an issue of first impression in this Court, the district

24

court decided it was also necessary to engage in a prejudice analysis. Id. at 1189. The district court found that Wilk did not suffer any prejudice from the timing of the February 2005 Death Notice because: (1) the Death Notice was filed within the deadline imposed by the district court; (2) defense counsel had already received the district court's permission for eleven experts, some of which related solely to penalty phase issues; (3) the death penalty was addressed at each of the status conferences; (4) the magistrate judge initially informed appointed counsel to treat this as a death penalty case; (5) the district court and the parties had already discussed written juror questionnaires that included questions addressing the death penalty; and (6) the Death Notice merely parroted information that was already known. Id. Based on these factors, the district court further found that for "defense counsel to now suggest surprise strikes this Court as being opportunistic and disingenuous." Id. The district court denied Wilk's motion to strike the Death Notice. Id. at 1190. Wilk timely appealed.

## II. DISCUSSION

### A. Jurisdiction

We first examine our jurisdiction to hear Wilk's appeal from the district court's order denying his motion to strike the Death Notice.[16] Section 1291 of

---

[16]We review jurisdictional questions, including the appealability of the denial of a pretrial motion to strike a Death Notice, de novo. United States v. Cartwright, 413 F.3d 1295, 1299

Title 28 grants us jurisdiction over appeals "from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. The district court's denial of Wilk's motion to strike is clearly a non-final, interlocutory decision. However, we have jurisdiction to hear appeals from non-final decisions that fall within the "collateral order" doctrine. See Sell v. United States, 539 U.S. 166, 176, 123 S. Ct. 2174, 2182 (2003); Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546-47, 69 S. Ct. 1221, 1225-26 (1949). Under the collateral order doctrine, we have jurisdiction over an interlocutory order if it "(1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." Sell, 539 U.S. at 176, 123 S. Ct. at 2182 (quotation marks and alterations omitted) (emphasis added).

The Fourth Circuit is the only other circuit to consider whether the denial of a motion to strike a § 3593(a) death penalty notice is reviewable under the collateral order doctrine. See Ferebe, 332 F.3d at 726-30. In Ferebe, the Fourth Circuit concluded that the district court's order denying a motion to strike the government's death notice was reviewable as a collateral order because such orders "are conclusive, collateral to the merits, and if wrongly decided will irreparably

_____

(11th Cir. 2005), cert. denied, __ U.S. __, 126 S. Ct. 1116 (2006).

26

deprive capital defendants of an important right[.]"[17] Id. at 730; accord United

States v. Breeden, 366 F.3d 369, 372-73 (4th Cir. 2004).  We agree with our sister

circuit and conclude that we have jurisdiction over Wilk's appeal.[18]

## B.    Objective Reasonableness

The sole issue on appeal is how to apply § 3593(a), which provides that the

government shall serve, "a reasonable time before the trial," notice to the defendant

stating that the death penalty is justified and listing the aggravating factors.  18

U.S.C. § 3593(a).[19]  Section 3593 does not specify what constitutes "a reasonable

---

[17]The Fourth Circuit described the right created in § 3593(a) as the "right not to be convicted and sentenced without adequate time to prepare, but also the right not to stand trial for one's life absent the same[.]"  Ferebe, 332 F.3d at 730.

We also agree with one court's observation that "there are practical reasons weighing against the post-trial assessment of whether the statute [§ 3593(a)] has been violated; to conduct a capital trial only to strike the death-penalty notice afterwards would be a colossal waste of time, effort and expense for both litigants and the courts."  United States v. McGriff, __ F. Supp. 2d __, __, 2006 WL 979305, at *12 (E.D.N.Y. Apr. 13, 2006).

[18]Our jurisdictional conclusion is also informed by the fact that this case presents an important issue of first impression completely separate from the merits.  Furthermore, given that we later conclude that continuances of a trial can cure any issue about whether a particular § 3593(a) notice is untimely, there should be little need for future interlocutory appeals as to a § 3593(a) notice.  We may always decline collateral order review where the appeal is clearly frivolous.  See In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1095 (5th Cir. 1977) (noting that an interlocutory appeal must address "'serious and unsettled question(s)' of law . . . that this court has not previously addressed and are particularly appropriate for resolution as a collateral order") (citation omitted); see also Sell, 539 U.S. at 176, 123 S. Ct. at 2182 (collateral order "raises questions of clear constitutional importance"); Cohen, 337 U.S. at 547, 69 S. Ct. at 1226 (collateral order "presents a serious and unsettled question"); see generally Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

[19]Section 3593(a) provides, in relevant part:
If . . . the attorney for the government believes that the circumstances of the

time before the trial." This case presents an issue of first impression in this circuit as to what is "a reasonable time before the trial" under § 3593(a).[20]

We first conclude that the applicable test is one of objective reasonableness. See Breeden, 366 F.3d at 373 (stating that "[a]nalysis of whether the right to reasonable notice has been violated requires an inquiry into the objective reasonableness of the timing of the notice"); Ferebe, 332 F.3d at 731 (stating that courts must conduct "a pretrial inquiry into the objective reasonableness of the notice provided" under 18 U.S.C. § 3593(a)).[21] Further, to determine whether notice was filed an objectively reasonable time before trial, we must consider the

---

offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice--
(1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and
(2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.
18 U.S.C. § 3593(a).

[20]The interpretation of a statute, such as § 3593, is a question of law subject to de novo review. United States v. Searcy, 418 F.3d 1193, 1195 (11th Cir. 2005), cert. denied, __ U.S. __, 126 S. Ct. 1107 (2006).

[21]When called upon to determine reasonableness in other contexts, our circuit has used an objective reasonableness standard. See, e.g., United States v. Greer, 440 F.3d 1267, 1272 (11th Cir. 2006); Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005); United States v. Robinson, 336 F.3d 1293, 1295 (11th Cir. 2003).

28

totality of the circumstances,[22] including, but not limited to: (1) what transpired in the case before the formal Death Notice was filed; (2) the period of time remaining for trial after the Death Notice was filed; (3) the status of discovery and motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense, if known.[23]

Having spared no expense in the factual and procedural history discussion above, we can now readily undertake the analysis of whether the government gave reasonable notice before the trial. As to the first factor, the events described above demonstrate that, from the start, all parties knew this was a likely death penalty case, and thus, Wilk's counsel, who had extensive capital crimes experience, began to prepare a death defense months before the Death Notice was filed on February 18, 2005. For example, as early as September 16, 2004, he requested ex parte

[22]The totality of the circumstances approach is consistent with how we have determined reasonableness in a variety of other contexts in criminal cases. See, e.g., Padgett v. Donald, 401 F.3d 1273, 1280 (11th Cir. 2005); Conklin v. Schofield, 366 F.3d 1191, 1204 (11th Cir. 2004); Hubbard v. Haley, 317 F.3d 1245, 1252-53 (11th Cir. 2003); United States v. Hunter, 291 F.3d 1302, 1306-07 (11th Cir. 2002); United States v. Brundidge, 170 F.3d 1350, 1352-53 (11th Cir. 1999); Blanco v. Singletary, 943 F.2d 1477, 1508 (11th Cir. 1991); United States v. Tobin, 923 F.2d 1506, 1519 (11th Cir. 1991).

[23]We recognize that the Fourth Circuit generally adhered to four articulated factors in evaluating the reasonable timeliness of a Death Notice. See Ferebe, 332 F.3d at 737; Breeden, 366 F.3d at 374. However, the Fourth Circuit also described those four factors as "among other factors that may appear relevant[.]" Ferebe, 332 F.3d at 737. Our conclusion that evaluating objective reasonableness requires an unrestricted evaluation of all the circumstances is thus not inconsistent with the Fourth Circuit's approach.

funds for investigation and mitigation experts related to the death penalty and made an ex parte request for a second death-qualified counsel under 18 U.S.C. § 3005.[24]  Wilk's counsel also moved to continue the trial, originally calendared for November 1, 2004, due to, among other things, the probability that Wilk would be subject to the death penalty.  Then, on October 28, 2004, Wilk's counsel requested a continuance of the December 13, 2004, trial due to discovery issues and a December 13 meeting with the Department of Justice regarding the death penalty.

Additionally, from November 2004 to January 2005, Wilk requested and was granted funding for eight more experts, some of whom related solely to preparation for the penalty phase.  At the January 5, 2005, status conference, the parties discussed a jury questionnaire containing questions on capital punishment. The statutory aggravating factors listed in the February 18, 2005, Death Notice had already been disclosed in the October 21, 2004, superseding indictment.  In short, before the formal February 18 Death Notice, Wilk's counsel undertook significant preparation for a death defense.

As to the second factor, the time interval between the Death Notice and the

---

[24]"Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours."  18 U.S.C. § 3005.

trial was six months from February 18 to August 29 and was clearly adequate to prepare a death defense in this case. The government's Death Notice was objectively reasonable notice on this basis alone.[25]

We reject Wilk's argument that April 18, the scheduled trial date at the time the original Death Notice was filed, is the outer limit and that the relevant interval is only two months from February 18 to April 18. Wilk ignores the fact that § 3593(a) states that the Death Notice must be filed "a reasonable time before the <u>trial</u>," not a reasonable time before the date the trial was scheduled to begin when the Death Notice was formally filed. <u>See</u> 18 U.S.C. § 3593(a) (emphasis added). Section 3593(a) does not state "before the date of trial," but rather states "before the trial . . . ." <u>See</u> <u>id.</u> Simply put, there is nothing in § 3593 that restricts courts to counting only the days between the Death Notice and a scheduled trial date at the time of the filing of the Death Notice.[26]

_____

[25]Several district courts have applied the objective reasonableness standard and concluded that even less time is reasonable. <u>Compare</u> <u>United States v. Ponder</u>, 347 F. Supp. 2d 256, 270 (E.D.Va. 2004) (notice filed within court-imposed filing deadline and approximately four months before a possible trial date is reasonable), <u>and</u> <u>United States v. Le</u>, 311 F. Supp. 2d 527, 534-35 (E.D.Va. 2004) (113 days' notice is reasonable), <u>with</u> <u>McGriff</u>, __ F. Supp. 2d at __, 2006 WL 979305, at *15-*17 (concluding that twelve days' notice was not objectively reasonable but granting a continuance of the trial date), <u>United States v. Le</u>, 316 F. Supp. 2d 343, 346, 352-55 (E.D.Va. 2004) (113 days' notice still objectively reasonable, but amended Death Notice, containing different aggravating factors and filed ninety-four days before trial, was not objectively reasonable), <u>and</u> <u>United States v. Hatten</u>, 276 F. Supp. 2d 574, 579 (S.D.W.Va. 2003) (suggesting that thirty-six days' notice is unreasonable).

[26]A few district courts have examined whether the amount of time the government took to make a decision about whether to pursue the death penalty was reasonable. <u>See</u> <u>Ponder</u>, 347 F.

Wilk also argues that we should not use the August 29 trial date because the district court continued the April 18 trial date merely to cure the government's untimely Death Notice. We reject this argument for two reasons. First, Wilk's contention is not supported by the record. Rather, the record shows that, at the April 1 status conference, the district court continued the trial date from April 18 to August 29 due to the existence of numerous unresolved motions, the fact that Wilk had not yet disclosed any of his eleven experts to the government, and Wilk's request for a Daubert hearing on the government's experts. The district court also emphasized that the government had filed the Death Notice by the February 18 deadline set by the district court and that this Notice was reasonable even if the trial was to be held on April 18. The record supports the government's position that the district court did not continue the trial to cure an untimely notice.

Second, even if the district court continued the trial to August 29, as Wilk argues, wholly or in part to remedy a Death Notice that would otherwise be untimely without a continuance or to remove any issue about its timeliness, the

Supp. 2d at 263-65; Hatten, 276 F. Supp. 2d at 578. We reject that approach as § 3593(a) is designed to protect the defendant from having to stand trial for his life without reasonable notice and time to prepare adequately. The § 3593(a) requirement does not obligate us to examine whether the government's ongoing decisionmaking process took too long. The proper approach is to focus on whether the Death Notice reasonably gave the defendant adequate time before trial to prepare a defense, not whether the government reasonably should have made a decision earlier than it did. In addition, there is no allegation in this case that the government actually made a decision but then in bad faith intentionally delayed advising Wilk of its decision in order to shorten Wilk's preparation time.

district court acted properly.[27]  Section 3593 is silent as to the remedy for such a Death Notice.  Nonetheless, the obvious purpose of the § 3593(a) notice requirement is to make sure a defendant has adequate time to prepare for a death defense.  Continuing the trial after the Death Notice is filed does not undermine but rather preserves the defendant's statutory right not to stand trial for his life without reasonable notice of the government's intent to seek the death penalty.  Where a district court determines that the Death Notice was filed at a time when either party, particularly the defense, would reasonably be unprepared for a capital trial on the previously scheduled trial date, a continuance of the trial is appropriate.[28]  That a district court continues an earlier scheduled trial date for a murder case after a Death Notice is filed in order to make sure defense counsel has adequate

---

[27]In support of his contention that the district court was motivated by concern over the timing of the Death Notice, Wilk stresses that during the April 1 status conference, the government expressed concern that the defense had filed motions "claiming a lack of notice," and that Wilk had not disclosed his expert witnesses.  "If this case is tried at a time in late summer or something of that nature or fall," the government added, "I think the defense would certainly not have the ability to claim that they aren't ready to try this case, that they don't have sufficient notice, of the inability to defend a death penalty matter."  Appellant's Brief at 10; R15 at 10-12, 15.

[28]We recognize that the Fourth Circuit analyzed the time interval as "the period of time remaining before trial, measured at the instant the Death Notice was filed."  Ferebe, 332 F.3d at 737.  We do not find persuasive Ferebe's suggestion that a court may not effectively address the concerns raised by a motion to strike a Death Notice as untimely by postponing the trial.  See id. at 737-38; cf. id. at 741 (Niemeyer, J., dissenting) ("[The majority] reads the statute to require a death penalty notice to be given a reasonable time before the date of trial . . . not before the trial, as the statute provides.").  One district court in the Fourth Circuit has read Ferebe narrowly and stated that it was not restricted to using the scheduled trial date when the Death Notice was filed "if the court knows, and the parties are reasonably aware, that the matter is not actually proceeding to trial on that date."  Ponder, 347 F. Supp. 2d at 267.

33

preparation time for a now-required death defense is to be commended even if in the process it cures what might have otherwise been an untimely Death Notice.[29]

Finally, we point out practical reasons why allowing continuances is appropriate. It is routine for trial dates to change in murder cases, and even more so in capital cases, just as it did here. Indeed, the trial date in this case moved twice at Wilk's request: from November 1, 2004, to December 13, 2004, and then to April 18, 2005. When the district court continued the trial from December 13, 2004, to only April 18, 2005, Wilk still objected, stating that he could not be ready even by May 2005 if the government sought the death penalty.[30]

During this same time period, the government conducted a deliberate and full consideration of whether this murder case should become a death penalty case, including meeting with Wilk's counsel in September and December 2004 about

---

[29]Indeed, "[t]he filing of a motion to strike the death notice as untimely is an obvious indication that the defendant needs more time to prepare for trial." United States v. Pepin, 367 F. Supp. 2d 315, 319 (E.D.N.Y. 2005) (addressing language in 21 U.S.C. § 848(h)(1) identical to § 3593(a)).

We expressly do not reach the issue of whether the Death Notice would have been untimely if the trial date had remained April 18 and not been continued. Rather, even assuming arguendo that the Death Notice might have been otherwise problematic without the continuance, we point out that the continuance easily cured any potential problem.

[30]The government argues that Wilk's April 1 statement that he was prepared for a non-capital trial on April 18 is inconsistent with his repeated requests for continuances and the outstanding motions and discovery matters. The government emphasizes that Wilk had more than fifty motions pending and needed a continuance of the April 18 trial even if it was a non-capital trial. We need not address that issue as we do not measure the time interval using the date for which trial was merely scheduled at the time the Death Notice was filed.

34

that issue. That the government's decisionmaking process affords an opportunity for input by the defendant through counsel is a good thing, but it adds to the protracted nature of the decisional process.[31] While that protracted process is ongoing, the district courts, understandably, endeavor to move their murder cases along by setting early trial dates that may be realistic if the government decides not to seek the death penalty, but may become unrealistic when the Death Notice is filed and the case becomes a death penalty case with certainty. A rule that measures the time interval from the date the Death Notice is filed to the scheduled date of trial at the time of that filing unduly restricts the district court's ability to manage its cases and is simply not required by § 3593(a). Allowing continuances after the Death Notice is filed (1) permits the government to receive input from defense counsel and to make the death penalty decision with full and cautious deliberation, while still (2) accomplishing the goal of § 3593(a) to assure that defendants have adequate time to prepare a defense to the death penalty and do not stand trial for their life without reasonable notice. District courts should have the ability to set trial dates to move the case along while it is a more simple murder case but then continue the trial date if and after a Death Notice is actually filed.

---

[31]One court has noted that "credible statistics disclose that the average interval between death-penalty eligibility and the filing of a death-penalty notice is approximately eight months." McGriff, __ F. Supp. 2d at __, 2006 WL 979305, at *15 (citing statistics derived from raw data compiled by the Capital Defense Network). The time here was six months.

35

Our determination that the continuance was proper and the time interval between the Death Notice and the trial was six months allows us to dispense quickly with the third, fourth, and fifth factors. As to the third factor, six months was not only an objectively reasonable notice to complete the remaining discovery and motions, it was more than enough time. Wilk stresses the fourth factor – the nature of the charges in the indictment – and that the nineteen-page second superseding indictment contains seven counts, spans a broad period of time (nearly four years), involves serious and lengthy allegations, and identifies evidence (particular computer evidence) requiring expert access and review. The indictment also contains an obstruction of justice count involving judicial proceedings almost four years earlier as well as a count of possession of child pornography. Even so, we conclude that, given the six-month preparation period, the third and fourth factors in this case both weigh in favor of the government.

As to the fifth factor, the October 21, 2004, indictment listed the same statutory aggravating factors as did the Death Notice. Further, as noted by the district court, the aggravating factors merely tracked the language of the statute. While the February 18 Death Notice added some non-statutory aggravating factors, those too were straightforward. Thus, the fifth factor does not aid Wilk.

This leaves the nature of the defense. We purposefully have not described

36

the eleven experts for whom the defense obtained funding in ex parte motions before the Death Notice was filed. Given the ex parte nature of the motions, we are also reluctant to describe the nature of the potential defenses revealed therein. We do conclude, however, that six months is clearly more than sufficient time no matter what approach the defense decides to take. Thus, this factor also does not help Wilk.

In sum, considering all the circumstances of the case, we conclude that the government provided objectively reasonable notice of its decision to seek the death penalty and of the aggravating factors claimed to justify the death penalty. Accordingly, the district court properly denied Wilk's motion to strike the Death Notice.

### III. CONCLUSION

For the above reasons, we affirm the district court's denial of Wilk's motion to strike the government's Death Notice.[32]

**AFFIRMED.**

---

[32]We also reject Wilk's argument that § 3593(a) requires personal service of the Death Notice. See Fed. R. Crim. P. 49(b) ("When these rules or a court order requires or permits service on a party represented by an attorney, service must be made on the attorney instead of the party, unless the court orders otherwise.").